# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ERIK D. NORDHAUSEN,
Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
Defendant.

Case No. 1:18-cv-738

Cole, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Erik D. Nordhausen, brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Commissioner of Social Security ("Commissioner")

denying his application for disability insurance benefits ("DIB"). This matter is before the Court

on plaintiff's statement of errors (Doc. 9), the Commissioner's response in opposition (Doc. 10),

and plaintiff's reply memorandum. (Doc. 11).

## I. Procedural Background

Plaintiff filed his application for DIB on July 30, 2015, alleging disability since January

1, 2014 due to delusions, obesity, excessive tiredness and sleepiness, short attention span and

sustained focus difficulties, diabetic symptoms, hypertension, stiffness in his back and arm

muscles, sleep apnea, gastric reflux, and difficulty with social interactions. The application was

denied initially and upon reconsideration. Plaintiff, through counsel, requested and was granted

a *de novo* hearing before administrative law judge ("ALJ") Thuy-Anh T. Nguyen. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing on December 14, 2017. On

May 23, 2018, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request

for review by the Appeals Council was denied, making the decision of ALJ Nguyen the final

decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

2

perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2020.

2. The [plaintiff] has not engaged in substantial gainful activity since January 1, 2014, the alleged onset date (20 CFR 404.1571, *et seq.*).

3. The [plaintiff] has the following severe impairments: schizoaffective disorder, schizophrenia, degenerative changes of the lumbar spine, obesity, diabetes mellitus, and metabolic syndrome (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform medium work as defined in 20 CFR 404.1567(c) except occasional balancing, stooping, kneeling, crouching, crawling, and climbing of ramps and stairs, and never climbing of ladders, ropes, or scaffolds. The [plaintiff] is capable of simple, routine tasks that do not require fast paced or high production standards. He can occasionally interact with supervisors and coworkers but cannot interact with the general public. He is limited to low stress jobs, defined as those with occasional decision-making and occasional changes in the work setting, with changes explained in advance. He will be off-task 5-10% of the workday.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[2]

---

[2] Plaintiff has past relevant work as a server, which is a light, semi-skilled job, but medium exertion as actually performed. (Tr. 25, 59, 330).

7. The [plaintiff] was born [in] . . . 1973 and was 40 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix II).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[3]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from January 1, 2014, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 15-26).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative medium, unskilled jobs such as linen room attendant, with 39,360 jobs in the national economy; janitor, with 39,330 jobs in the national economy; and dishwasher, with 383,690 jobs in the national economy. (Tr. 26, 61).

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

**D. Specific Errors**

On appeal, plaintiff alleges two assignments of error: (1) the ALJ failed to give the opinions of his treating physician controlling weight by misconstruing plaintiff's testimony on the severity of his impairments and the record as a whole, and (2) the ALJ failed to support her finding of "not disabled" with substantial evidence based on the VE's testimony. (Doc. 9).

### 1. Whether the ALJ erred in giving partial weight to the opinions of plaintiff's treating physician.

Plaintiff argues that the ALJ erred by failing to give his treating physician's opinions controlling weight. (Doc. 9 at 3). Plaintiff argues that the ALJ mischaracterized the evidence in the record to justify her reasoning, including plaintiff's self-reports and testimony regarding the severity of his impairments. (*Id.* at 3-4). Plaintiff also argues that his self-reports and testimony

are "not objective medical information within the record, and should have little impact on the opinion of Dr. Garrison as the treating physician." (*Id.* at 4).

Dr. Jonathan Garrison, M.D., treated plaintiff every three months since 2008. (Tr. 461). Dr. Garrison rendered two opinions on plaintiff's mental functioning. (Tr. 391-96, 461-67). In a January 2016 mental status questionnaire, Dr. Garrison described plaintiff's mental status as follows: adequate appearance; normal flow of conversation and speech; anxious, dysphoric, and constricted mood and affect; guarded and evasive signs, symptoms, and severity of anxiety; paranoid thinking disorders; decreased memory; and minimal insight. (Tr. 391). Dr. Garrison opined that plaintiff was good at remembering, understanding, and following directions; fair at maintaining attention, sustaining concentration, and completing tasks; poor to fair at reacting to change in the work setting; and very poor in the area of social interaction and adaptation. (Tr. 392). Dr. Garrison listed plaintiff's diagnosis as schizoaffective disorder since 2001. (*Id.*).

In a March 2017 mental impairment questionnaire, Dr. Garrison listed plaintiff's DSM-V Assessment as Schizoaffective Disorder. (Tr. 461). Dr. Garrison indicated that plaintiff's response to his Abilify medication was fair to good. (*Id.*). Dr. Garrison listed clinical findings demonstrating the severity of plaintiff's mental impairments and symptoms as paranoid delusions, anxious mood, and guarded. (*Id.*). He described plaintiff's prognosis as "chronic." (*Id.*). Dr. Garrison identified plaintiff's signs and symptoms as follows: delusions or hallucinations; depressed mood; diminished interest in almost all activities; appetite disturbance with change in weight; observable psychomotor agitation or retardation; decreased energy; irritability, involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; distrust and suspiciousness of others; detachment from social relationships; disturbance in mood or behavior; and disproportionate fear or anxiety about at least two different situations (for

6

example, using public transportation, being in a crowd, being in a line, being outside his/her home, being in open spaces). (Tr. 462). Dr. Garrison opined that plaintiff was "seriously limited" (defined as having noticeable difficulty (e.g., distracted from job activity) from 11 to 15% of the workday or work week) in his ability to perform the following unskilled work-related activities: perform at a consistent pace and accept instructions and respond appropriately to criticism from supervisors. (Tr. 463). Dr. Garrison further opined that plaintiff was "unable to meet competitive standards" (defined as having noticeable difficulty (e.g., distracted from job activity) from 16 to 25% of the workday or work week) in his ability to perform the following unskilled work-related activities: deal with normal work stress and respond appropriately to changes in routine work settings. (*Id.*). Overall, Dr. Garrison opined that plaintiff had no limitations in understanding, remembering, and applying information; moderate limitations in his ability to interact with others and concentrate, persist, or maintain pace; and marked limitations in his ability to adapt or manage himself. (Tr. 465). Dr. Garrison further opined that plaintiff's impairments would cause him to miss about three days of work per month. (Tr. 466).

The ALJ afforded Dr. Garrison's January 2016 opinion "partial" weight. (Tr. 23). The ALJ noted that Dr. Garrison was familiar with plaintiff's symptoms and impairments, and his diagnosis of schizoaffective disorder and paranoid delusions were consistent with his opinion. (*Id.*). However, the ALJ noted that Dr. Garrison's opinion was inconsistent with plaintiff's self-report of functioning, where he reported getting along well with people, socializing with family, cooking for himself, managing his own finances, and going shopping alone. (*Id.*). The ALJ also noted that Dr. Garrison's opinion that plaintiff had decreased memory and minimal insight was inconsistent with his opinion that plaintiff is good at remembering, understanding, and following directions. (*Id.*) (citing Tr. 391).

7

The ALJ also afforded Dr. Garrison's March 2017 opinion "partial" weight. (*Id.*). The ALJ noted that the degree of limitation suggested by Dr. Garrison in this opinion was more extreme than supported by the records and plaintiff's activities of daily living. (*Id.*). The ALJ explained that Dr. Garrison's opinion that plaintiff had marked limitations in adapting and serious limitations in travelling to an unfamiliar place was inconsistent with plaintiff's self-reports that he drives, shops alone, and attends cookouts and treatment notes indicating that he travelled to India and Las Vegas with his mother. (*Id.*). The ALJ further explained that Dr. Garrison's opinion that plaintiff had decreased memory and minimal insight was not entirely consistent with his opinion that plaintiff had mild or no limitations in understanding and memory. (*Id.*).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See*

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave valid reasons for affording Dr. Garrison's opinions less than "controlling weight" and only "partial" weight and those reasons are substantially supported by the evidence of record. Contrary to plaintiff's argument, the ALJ thoroughly reviewed both the objective and subjective evidence of record and provided good reasons for giving Dr. Garrison's opinions less than "controlling weight." The ALJ recognized that plaintiff treated with Dr. Garrison since 2008 with therapy sessions every three months. (Tr. 21). Nevertheless, the ALJ reasoned that Dr. Garrison's treatment notes and plaintiff's self-reported symptoms were not entirely

9

consistent with the degree of functional limitations alleged. (Tr. 22). The ALJ considered the inconsistency of Dr. Garrison's treatment notes both prior to plaintiff's alleged onset date and after. (Tr. 21-22). The ALJ noted that prior to the alleged onset date, treatment notes generally reflected that his schizoaffective disorder and mood were stable. (Tr. 21). In November 2015, Dr. Garrison noted that plaintiff was more paranoid and evasive, and he presented with persecutory delusions and frustration from past slights against him. (*Id.*) (citing Tr. 397). However, by February 2016 (notably, after Dr. Garrison completed the January 2016 mental status questionnaire), plaintiff's dosage of Abilify was increased and he was less agitated and irritable. (Tr. 21) (citing Tr. 534). The ALJ noted that in May 2016, plaintiff continued to reject different medication options or dose changes. (Tr. 22). Plaintiff continued to display persecutory delusions but had a euthymic mood with partial insight and good judgment. (*Id.*). Dr. Garrison noted that plaintiff's schizoaffective disorder remained stable. (Tr. 534). The ALJ reasonably determined that "[t]he infrequency of the [plaintiff]'s therapy and rejection of more aggressive treatment is not entirely consistent with the degree of functional limitations alleged." (Tr. 22).

The ALJ further considered that by August 2016, plaintiff reported going on vacations and meeting friends with little difficulty. (Tr. 22) (citing Tr. 535). Treatment notes from February 2017 indicated that plaintiff's mood and behavior at home were manageable; therefore, he rejected increased medication to help with paranoia. (Tr. 535). Despite opining in the March 2017 report that plaintiff had a marked functional limitation in his ability to adapt or manage himself (defined by the questionnaire as an ability to regulate emotions, control behavior, and maintain well-being in a work setting), Dr. Garrison's treatment notes from May 2017 indicated that although plaintiff's paranoid thoughts were still present, his episodes of agitation and upset

10

were infrequent, with "only one episode of extended upset and agitation since last seen [in February 2017], and there was no destruction or aggression as part of this episode." (Tr. 22) (citing Tr. 546). Plaintiff has not cited any objective evidence to demonstrate that his mental limitations are consistent with Dr. Garrison's opinions. The lack of corroborating mental status examination findings is a valid reason to discount the treating psychiatrist's opinion. *See Norris v. Comm'r of Soc. Sec.*, 461 F. App'x 433, 439 (6th Cir. 2012) ("Any record opinion, even that of a treating source, may be rejected by the ALJ when the source's opinion is not well supported by medical diagnostics. . . .") (citing 20 C.F.R. § 416.927; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)).

In addition to considering that Dr. Garrison's own treatment notes were inconsistent with his opinions, the ALJ reasonably found that plaintiff's self-reports and daily activities were inconsistent with Dr. Garrison's opinions. *See Monroe v. Colvin*, 989 F. Supp. 2d 612, 622 (S.D. Ohio 2013) (upholding ALJ's decision declining to give controlling weight to treating physician because it was inconsistent with plaintiff's reported daily activities). In January 2016, Dr. Garrison opined that plaintiff functioned poorly in the areas of social interaction and adaptation. (Tr. 392). Likewise, in March 2017, Dr. Garrison opined that plaintiff had marked limitations in his ability to adapt and manage himself. (Tr. 465). However, plaintiff reported being able to do a variety of daily activities inconsistent with the functional limitations assessed by Dr. Garrison, including cooking meals, reading, walking, watching TV, talking with his mother and brother, vacuuming, doing dishes, and taking out the garbage. (Tr. 22) (citing Tr. 221-29; 271-78). Plaintiff also reported driving, shopping alone, handling his own finances, maintaining an aquarium, going to cookouts, visiting with friends, and travelling with his mother. (*Id.*).

Plaintiff argues that this information is "inherently unreliable due to the claimant

11

suffering from schizoaffective disorder and delusions." (Doc. 9 at 4). Plaintiff cites to his testimony at the hearing that he believes voices that he hears are real and therefore "in his mind, he is not behaving irrationally." (*Id.*) (citing Tr. 51). Plaintiff argues that the ALJ failed to consider this testimony. (*Id.*). However, contrary to plaintiff's argument, the ALJ considered this testimony and recognized that it was unsupported by treatment notes, which never indicated that plaintiff heard voices or had auditory hallucinations. (Tr. 22). In his reply brief, plaintiff argues that "a reasonable mind would not accept the self-reporting of a claimant who suffers from delusions over his treating doctor." (Doc. 11 at 2). Plaintiff, however, has failed to cite to objective medical evidence or a medical opinion from Dr. Garrison or other physician to support the argument that he misrepresented information about his ability to perform daily activities as a result of his schizoaffective disorder. In any event, the ALJ appropriately declined to give controlling weight to Dr. Garrison's opinions based on the lack of supportability and consistency with Dr. Garrison's own treatment notes, not solely based on plaintiff's reported activities.

Plaintiff also argues that the ALJ misconstrued his reported activities, including shopping alone, driving, going to cookouts, and travelling with his mother. (Doc. 9 at 5). Plaintiff argues that he neither performed these activities on a sustained basis or independently as would be comparable to performing a range of activities in a work setting. (*Id.*). However, the ALJ cited these activities as inconsistent with Dr. Garrison's opinion that plaintiff had marked limitations in adapting and serious limitations in travelling to an unfamiliar place. In addition, to the extent the ALJ may have "misconstrued" any limitations resulting from plaintiff's reported activities, the ALJ accommodated these limitations in the mental RFC. The ALJ limited plaintiff's mental RFC to: "capable of simple, routine tasks that do not require fast paced or high production standards. He can occasionally interact with supervisors and coworkers but cannot interact with

the general public. He is limited to low stress jobs, defined as those with occasional decision-making and occasional changes in the work setting, with changes explained in advance. He will be off-task 5-10% of the work day." (Tr. 19). Plaintiff has not demonstrated how this RFC fails to accommodate his mental limitations.

Finally, while the ALJ's decision does not reflect an extensive analysis of the regulatory factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6), the regulations require only that an ALJ's decision include "'good reasons . . . for the weight give[n] [to the] treating source's opinion'—not an exhaustive factor-by-factor analysis." *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (citing *Wilson*, 378 F.3d at 547). *See also Guinn v. Comm'r of Soc. Sec.*, 555 F. Supp. 2d 913, 920 (S.D. Ohio 2008) (ALJ's failure to mention regulatory factors may qualify as harmless error if the ALJ provided "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and [was] sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.") (quoting *Wilson*, 378 F.3d at 544). Here, the ALJ's decision reflects a consideration of the regulatory factors, albeit not explicitly. The ALJ considered Dr. Garrison's length of treatment relationship and frequency of examination with plaintiff. (Tr. 21). The ALJ also considered the consistency and supportability of Dr. Garrison's opinions with the record as a whole, including his own treatment notes and plaintiff's self-reported activities. Accordingly, the Court finds that the ALJ complied with the requisite two-step inquiry and gave "good reasons" for assigning Dr. Garrison's opinions "partial weight." Plaintiff's first assignment of error should be overruled.

### 2. Whether the ALJ's finding of not disabled is supported by the VE's testimony.

At Step Five of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Comm'r of Soc. Sec*, 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet his burden of identifying other work the claimant can perform through reliance on a VE's testimony in response to a hypothetical question. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).

In this case, the ALJ relied on the testimony of the VE to find that plaintiff could perform a substantial number of unskilled jobs given an RFC that limited plaintiff to "simple, routine tasks that do not require fast paced or high production standards"; occasional interaction with supervisors and coworkers but no interaction with the general public; and low stress jobs, defined as those with occasional decision-making and occasional changes in the work setting, with changes explained in advance, on the assumption he "will be off-task 5-10% of the workday." (Tr. 19, 61-63).

At the hearing, the ALJ asked the VE what jobs a hypothetical person with plaintiff's vocational background and RFC could perform. (Tr. 60-62). In response, the VE gave the representative unskilled jobs of linen room attendant, janitor, and dishwasher. (Tr. 61-62). During her questioning, the ALJ specifically asked the VE, consistent with her RFC finding,

14

whether an individual could perform these jobs if they were off task 5-10% of the workday. (Tr. 62-63). The VE answered that this limitation would not affect the number of jobs available in the national economy. (*Id.*).

On cross-examination, plaintiff's attorney asked the VE a hypothetical question based on specific limitations set forth in Dr. Garrison's 2017 report. Dr. Garrison was asked to rate plaintiff's limitations on the ability to perform 14 mental abilities and aptitudes needed to do unskilled work. (Tr. 463). Dr. Garrison stated that plaintiff's ability to perform seven mental abilities and aptitudes for unskilled work was "limited but satisfactory," which was defined as the patient "has noticeable difficulty (e.g., distracted from job activity) no more than 10% of the workday or work week." These seven abilities include the ability to: remember work-like procedures; maintain attention for a two-hour segment; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms; ask simple questions or request assistance; and get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. (Tr. 463). Plaintiff's attorney asked the VE to assume an individual would be distracted no more than 10% of the workday or workweek from performing these seven abilities and aptitudes. In response, the VE stated that such an individual would be unable to perform competitive work. The colloquy included the following discussion:

> [Attorney] Q. Okay. And the treating source has opined that he would be limited but satisfactory in the following areas meaning he would be distracted from job activities etcetera or unable to perform them more than 10% of the workday or workweek but I want you to assume all these in combination. Number one, remember work like procedures. Number two, maintain attention for a two hour segment. Sustain an ordinary routine without special supervision. Work in coordination with or proximity to others without being unduly distracted. Complete

15

a normal workday or workweek without interruption from his psychologically based symptoms. Ask simple questions or request assistance and finally get along with coworkers or peers without unduly distracting them or exhibiting behavior extremes. So taking all those in combination, what would be your opinion on somebody like that being able to maintain competitive employment?

[VE] A. All the points that you just made, you gave a number of 10%. If that's a total of 10% of the workday -- if it's just 10%, *it's going to affect any competitive work opportunity in the unskilled work atmosphere where any of those at that 10% threshold*, any of themselves but it's a combination of all of them. That's most likely not going to be consistent with a competitive work opportunity. That's going to require the employer to either have an alternate work schedule, a job coach or some kind of difference in that personnel file with this specific employee. They're having to address this employment opportunity differently than other employees with the same paygrade, same job title.

[Attorney] Q. So if I understand you correctly, if he has these limitations no more than 10% of the day but it's going to happen, you know, during the day in combination –

[VE] A. Right. Right.

[Attorney] Q. – that results in really an accommodated work –

[VE] A. There's going to have to be some kind of a shelter type atmosphere from that employer.

(Tr. 65-66) (emphasis added).

Plaintiff argues that the ALJ's Step Five finding is not supported by substantial evidence because her decision relies on VE testimony that is contradictory on the issue of whether an individual who is "off task" 10% of the work day or work week can perform a substantial number of unskilled jobs. (Doc. 9 at 6). Plaintiff argues that in response to the ALJ's questioning, the VE testified that being off task for 10% of the work day was near the acceptable limit for unskilled work. (*Id.* at 7) (citing Tr. 62-63). Plaintiff argues that this answer is inconsistent with the VE's response to his attorney's question, which indicated that an individual

with unskilled work abilities who was distracted no more than 10% of the workday or workweek would be limited essentially to a sheltered work environment. (*Id.*).

The Commissioner argues that the ALJ was not required to incorporate the VE's response to the work-related limitations asked by plaintiff's attorney because these limitations came directly from Dr. Garrison's March 2017 opinion, which the ALJ afforded only "partial weight." (Doc. 10 at 9).

In this case, the ALJ erred in relying on the VE's testimony at Step Five of the sequential evaluation process. The VE's testimony in response to the ALJ's hypothetical question directly contradicts the VE's testimony in response to the question posed by plaintiff's attorney on whether a hypothetical individual who is off task no more than 10% of the workday can perform a significant number of unskilled jobs.

Program Operations Manual System ("POMS") [4] DI 25020.010(B)(3) identifies the specific "mental abilities critical for performing unskilled work." The claimant must show the ability to:

    a. Remember work-like procedures (locations are not critical).
    b. Understand and remember very short and simple instructions.
    c. Carry out very short and simple instructions
    d. Maintain attention for extended periods of 2-hour segments (concentration is not critical).
    e. Maintain regular attendance and be punctual within customary tolerance. (These tolerances are usually strict.) Maintaining a schedule is not critical.
    f. Sustain an ordinary routine without special supervision

---

[4] *See* https://secure.ssa.gov/apps10/poms.nsf/lnx/0425005020. The POMS is used internally by employers of the SSA in evaluating Social Security claims and does not have the force and effect of law. *See Davis v. Sec'y of Health & Human Servs.*, 867 F.2d 336, 340 (6th Cir. 1989). The POMS explains the meaning of SSA terms as well as the meaning intended by terms appearing within the regulations. *Id.* (citing *Powderly v. Schweiker*, 704 F.2d 1092 (9th Cir. 1983)). Nevertheless, a court can find them "persuasive" (as the *Davis* court did), and other courts have observed that because "these guidelines [POMS] represent the Commissioner's interpretation of the statutory mandate, they deserve substantial deference, and will not be disturbed as long as they are reasonable and consistent with the statute." *Harper-Lee v. Astrue*, No. 2:11-cv-571, 2012 WL 4483007, at *6 (S.D. Ohio Sept. 27, 2012) (quoting *Bubnis v. Apfel*, 150 F.3d 177, 181 (2d Cir. 1998)).

g. Work in coordination with or proximity to others without being (unduly) distracted by them.

h. Make simple work-related decisions.

i. Complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (These requirements are usually strict.)

j. Ask simple questions or request assistance.

k. Accept instructions and respond appropriately to criticism from supervisors.

l. Get along with coworkers or peers without (unduly) distracting them or exhibiting behavioral extremes.

m. Respond appropriately to changes in a (routine) work setting.

n. Be aware of normal hazards and take appropriate precautions.

POMS DI 25020.010(B)(3).

The ALJ's hypothetical question asked whether there would be unskilled jobs for an individual with plaintiff's profile who was limited to, *inter alia*, simple, routine tasks, i.e., unskilled work.[5] Thus, an RFC for unskilled work necessarily includes the ability to perform all of the 14 mental abilities listed in the POMS. The hypothetical question posed by plaintiff's attorney tracked the precise language of the POMS for unskilled work and included a subset of seven abilities and aptitudes for unskilled work from the POMS list. (Tr. 65, 463). Both the ALJ and plaintiff's attorney asked the VE to assume that an individual could perform the specific abilities and aptitudes needed for unskilled work no more than 10% of the workday. In response

---

[5] Social Security regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. . . ." 20 C.F.R. § 416.968(a). *See Allison v. Apfel*, 229 F.3d 1150 (6th Cir.2000) ("We believe that the ALJ's qualification that Allison was limited to simple, repetitive, and routine tasks, within the category of light work, simply means that Allison is limited to unskilled light work."); *Weekly v. Comm'r of Soc. Sec. Admin.*, No. 1:13-cv-2108, 2015 WL 45529, at *6 (N.D. Ohio Jan. 2, 2015) (unskilled work involves simple, routine, and repetitive tasks). See also SSR 85-15, 1985 WL 56857, *4 (the mental demands of unskilled work are "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."); SSR 82-41, 1982 WL 31389, *2 (defining a "skill" as "knowledge of a work activity which requires the exercise of significant judgment that *goes beyond the carrying out of simple job duties* and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn) (emphasis added).

to the ALJ's question, which necessarily included all 14 aptitudes/abilities by virtue of a hypothetical assuming unskilled work, the VE testified there were a substantial number of unskilled jobs. (Tr. 62-63). However, in response to the attorney's question, which included a subset of seven aptitudes/abilities needed for unskilled work, the VE testified that the 10% limitation would preclude competitive employment. (Tr. 65-66). If being off task or distracted 10% of the time on seven unskilled work abilities precludes substantial gainful activity, then logically being off task or distracted 10% of the time on 14 unskilled work abilities would also preclude substantial gainful activity.[6] The VE's testimony is inconsistent and undermines the ALJ's finding that plaintiff could perform a substantial number of unskilled jobs based on the VE's testimony. The ALJ erred by relying on the VE testimony to meet her burden at Step Five of the sequential evaluation process as it is not clear whether a significant number of jobs exists for an individual with the 10% "off task" restriction identified by the ALJ. Therefore, plaintiff's second assignment of error should be sustained.

### III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings. On remand, the ALJ should

---

[6] Whether the ALJ afforded only "partial weight" to Dr. Garrison's opinion as the Commissioner argues does not change this analysis. The ALJ did not take issue with Dr. Garrison's opinion that plaintiff's ability to perform the seven identified unskilled work abilities was "limited but satisfactory." (Tr. 23). Moreover, even if Dr. Garrison's opinion is completely disregarded, it is inherently contradictory for the VE to testify that the ability to be off task for no more than 10% of a workday for the 14 abilities needed for unskilled work is not work preclusive, while being off task for no more than 10% of the workday for 7 abilities needed for unskilled work is work preclusive.

address and resolve the inconsistencies in the VE's testimony on plaintiff's ability to perform unskilled work give the 10% "off task" limitation set forth in the RFC.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _1/16/2020_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ERIK D. NORDHAUSEN,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-738
Cole, J.
Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn*, 474 U.S. 140 (1985); *United States* v. *Walters*, 638 F.2d 947 (6th Cir. 1981).